UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| NINA HU, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:25-cv-00028 |
| | ) | |
| KRISTI NOEM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiffs' Memorandum in Support of their Motion for a Temporary Restraining Order**

**Introduction**

Less than three weeks ago the plaintiffs ("Students") were all living the life of students, some undergraduate, some graduate, at Purdue, Ivy Tech, and Notre Dame Universities. The only thing that distinguishes them from many other students is that they are citizens of other countries. They have been allowed to attend school in the United States by virtue of being afforded F-1 status, a lawful non-immigrant status allowing them to study in the United States provided they abide by the applicable rules. Despite the fact that all of the plaintiffs have done so, with no prior notice whatsoever the defendants ("the United States") terminated their F-1 status. The Students are not alone: across the country, international students have had their status terminated, unlawfully and without process, and during the past ten days, nationwide at least fifteen temporary restraining orders have been issued by federal courts to enjoin these unlawful practices.

The Students are suffering immediate and irreparable harm, as well as the risk of further irreparable harm, as the termination of their F-1 status not only prevents them from continuing their studies but requires them to uproot their lives and depart the United States. If they do not, they are at risk of involuntary removal with all its attendant consequences. Their education has been disrupted, and their futures have been placed in jeopardy. For those who were employed by their universities, their employment has been terminated. They are deemed to be unlawfully present in the United States, which may significantly affect their future chance of reinstating their F-1 student status.[1] And they are forced to live with the fear that at any moment they may be detained, placed into removal proceedings, and involuntarily deported.

This removal of status represents final agency action by the United States, and the United States's actions violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), as they are arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law and the Constitution. Moreover, the Students have an entitlement to their F-1 status unless specific regulatory standards are met. Inasmuch as those standards were not met here, and as the Students have been afforded no opportunity to demonstrate their continuing entitlement, the actions of the defendants also violate basic principles of due process guaranteed by the Fifth Amendment to the United States Constitution.

---

[1] Pursuant to 8 C.F.R. § 214.2(f)(16)(i)(A), a student may be reconsidered for reinstatement to F-1 student status, at the discretion of the United States, only if they have not been out of status for more than 5 months, absent exceptional circumstances.

Because of the serious, continuing, and irreparable harm that the Students are suffering, they request that this Court grant a temporary restraining order setting aside the termination of their F-1 status and prohibiting the United States from detaining them or initiating removal proceedings against them until it may consider whether to convert the temporary restraining order into a preliminary injunction.

## Legal background

Federal law provides that noncitizens can enroll in government-approved academic institutions as F-1 students. *See* 8 U.S.C. § 1101(a)(15)(F). Students enter the United States on an F-1 visa issued by the United States Department of State.[2] Then, once they enter, students are granted F-1 student status and are permitted to remain in the United States (called "duration of status") as long as the student continues to meet the requirements established by the regulations governing the student's visa classification.[3]

The Department of Homeland Security's ("DHS") Student and Exchange Visitor Program (SEVP) is in charge of administering the F-1 student program and tracking information on students in F-1 student status. "SEVIS" is a web-based database that DHS

---

[2]     U.S. Dep't of State-Bureau of Consular Affairs, *Student Visa*, https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last visited Apr. 13, 2025).

[3]     U.S. Dep't of Homeland Sec., *Study in the States-Maintaining Status*, https://studyinthestates.dhs.gov/students/maintaining-status (last visited Apr. 13, 2025).

uses to track and monitor, among other persons, nonimmigrant students who have F-1 status.

An academic institution must obtain formal approval from DHS before it can sponsor a student's F-1 status. An institution must first file an application for School Certification through the SEVIS system. 8 C.F.R. § 214.3. Each school has a Designated School Official ("DSO") who monitors the student and who issues an I-20 form, which memorializes the student as someone admitted to the United States pursuant to an F-1 visa. *See* U.S. Dep't of Homeland Sec., *Study in the States*, https://studyinthestates.dhs.gov/students/prepare/students-and-the-form-i-20 (last visited Apr. 13, 2025). In addition to a traditional educational course of study, F-1 students may also participate in two types of practical training programs. 8 C.F.R. § 214.2(f)(10)(ii). Curricular practical training, or "CPT," includes "alternative work/study, internship, cooperative education, or any other type to required internship or practicum that is offered by sponsoring employers through cooperative agreements with the school" that is "an integral part of an established curriculum." 8 C.F.R. § 214.2(f)(1)(i). Optional Practical Training, or "OPT" consists of temporary employment that is directly related to the student's major area of study. 8 C.F.R. § 214.2(f)(1)(ii).

Once a student has completed his or her course of study and any accompanying practical training, they have sixty days to either depart the United States or transfer their status to another institution. 8 C.F.R. § 214.2(f)(5)(iv). If a student voluntarily withdraws

from the F-1 program, they have 15 days to depart the United States. *Id.* However, "an F-1 student who fails to maintain a full course of study without approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure." *Id*. Under the regulation, DSOs must report through SEVIS to SEVP when a student fails to maintain status. *See* 8 C.F.R. § 214.3(g)(2).

The regulations distinguish between two different ways in which a student may lose status: a student may "fail[] to maintain status," or there may be an agency-initiated "termination of status." Students fail to maintain their F-1 status if they do not satisfy the requirements imposed on F-1 students by federal regulations: if they fail to maintain a full course of study, engage in unauthorized employment, provide false information to DHS, or are convicted of a crime of violence for which a sentence of more than one year can be imposed. 8 C.F.R. § 214.2(e)-(g).

An agency-initiated termination of F-1 status—the other route to a loss of status— "is limited by [8 C.F.R.] § 214.1(d)." *Jie Fang* v. *Dir. U.S. Immig. & Cust. Enforc.*, 935 F.3d 172, 185 n.100 (3d Cir. 2019). Under 8 C.F.R. § 214.1(d), DHS can terminate F-1 student status only: (a) when "a waiver authorized on his or her behalf under" 8 U.S.C. § 1182(d)(3) or (4) is revoked; (b) when "a private bill to confer permanent resident status on such alien" is introduced; or (c) when notification of the termination is published in the Federal Register "on the basis of national security, diplomatic, or public safety reasons." Termination of F-1 status is reflected in SEVIS, and students will be notified of

their loss of status through their DSO. The revocation of a person's visa—that is, the paper that allowed them to originally enter the country or would permit their reentry—is distinct from the termination of a person's status. DHS itself indicates that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." *See* ICE Policy Guidance 1004-04 – Visa Revocations (June 7, 2010) at 3, available at https://www.ice.gov/doclib/sevis/pd/visa_revocations_1004_04.pdf (last visited Apr. 10, 2025); (Dkt. 5-1 ¶ 16).

To initiate removal of a noncitizen after their nonimmigrant status is revoked, DHS must file a Notice to Appear, which is the charging document that initiates immigration court proceedings. Once the Notice to Appear is filed, the individual may be taken into custody under a Warrant of Arrest. An Immigration Judge in a removal proceeding has no ability to review and reverse a SEVIS termination because the process is collateral to removal proceedings. *See Jie Fang,* 935 F.3d at 183; (Dkt. 5-1 ¶ 20). Therefore, the termination of a student's lawful status, as has occurred here, may lead to detention and the initiation of removal proceedings with the student not being able to contest the validity of the termination that is the cause for the removal. The termination of status, as reflected in the SEVIS record, represents final agency action for purposes of review under the Administrative Procedure Act. *See id.* at 185.

# Facts

The facts of each Student are set out in the Verified Complaint for Declaratory and Injunctive Relief. (Dkt. 1). Each of them has been allowed entry into the United States pursuant to an F-1 visa, and they have been attending universities located in the Northern District of Indiana—Purdue University, Notre Dame University, and Ivy Tech University (Fort Wayne). (Dkt. 1 ¶¶ 39-41; 56-57, 59; 71, 73; 80-81, 84-85; 101-102; 113-114; 136-137; 152-153). Each of them has fully complied with the requirements to maintain their visas. (*Id.* ¶¶ 46; 57; 75; 87; 104; 118; 141; 156). At least prior to the events giving rise to this litigation, they were students in good standing at their universities and have, in fact, excelled in their studies. (*Id.* ¶¶ 43; 59; 74; 85; 99; 102; 114-116; 137; 153-154). Nevertheless, each of them was recently notified by their schools that DHS had terminated their lawful F-1 status. (*Id.* ¶¶ 48; 60; 78; 89; 105; 121-122; 143; 158-159). To the extent any reason was given, and in some cases none was, the Students were informed in their notices from the DSO that their "SEVIS record and F-1 status were terminated . . . for the reason: OTHER-Individual identified in criminal records check and/or has had their VISA revoked." (*Id.*). Yet, five of the Students have no criminal records, (*id.* ¶¶ 48; 76-77; 87; 142; 157), and even where quasi-criminal records exist they reflect infractions that cannot serve as the basis for the termination of status (*id.* ¶¶ 61-62; 107; 126). Some of the Students received warnings, either from their school, an embassy or consulate, or the State Department, that because of their terminations, they are no longer lawfully in the United States and risk

detention and deportation if they remain. (*Id.* ¶¶ 63; 90-91; 122; 159). Even those Students who were not formally warned are aware of that impending risk. (*Id.* ¶¶ 50, 55; 83; 111; 148). As a result, they also risk accruing unlawful presence time, which could result in the future denial of entry to the United States. (Dkt. 5-1 ¶ 14).

The loss of their F-1 status is devastating to each of the Students. They will not be able to complete their studies (Dkt. 1 ¶¶ 54; 66-68; 81; 95-96; 110; 146; 162), and their lives have been disrupted in numerous other ways. Many have lost their income or risk losing upcoming job appointments and fellowships. (*Id.* ¶¶ 49; 92; 106; 117, 125; 138-139, 146; 154, 163). Mr. Odeoze and his wife, who had F-2 status,[4] are the parents of two small children who are American citizens and now have no income and face homelessness (*Id.* ¶¶ 119-120, 132-133). Many of the other Students will suffer financial harms for which they have no legal remedy, including payments for tuition (*id.* ¶¶ 53, 69), housing (*id.* ¶¶ 82, 97, 147), and vehicles (*id.* ¶ 131).

But of course, the most significant harm is the fact that at any point they may be swept from their homes, their campuses, or their city streets, placed in detention facilities, and subjected to involuntary removal to another country, though not necessarily their country of citizenship. (*Id.* ¶¶ 54-55; 70; 83; 98, 100; 111; 134-135; 150-151; 165-166). Many

---

[4]     F-2 status applies to the spouse of a person with F-1 status and terminates automatically should the F-1 holder lose status. *See* 8 C.F.R. § 214.2(f)(15); U.S. Dep't of Homeland Security- Study in the States, *Terminate or Reactivate a Dependent Record,* https://studyinthestates.dhs.gov/sevis-help-hub/student-records /dependents/terminate-or-reactivate-a-dependent-record (last visited Apr. 19, 2025).

are experiencing depression (*id*. ¶¶ 55, 150), difficulty sleeping (*id*. ¶¶ 55, 70, 83, 111), and severe stress and anxiety (*id*. ¶¶ 83, 98-100, 111, 134, 166). Mr. Zhu is having recurrent nightmares of being deported to a prison in El Salvador (*id*. ¶ 70), and Ms. Ni has nightmares of being detained and abused while in detention (*id*. ¶ 111). Ms. Hu and Mr. Yu have little interest in eating (*id*. ¶¶ 55, 83), and Ms. Ni suffers from fits of crying (*id*. ¶ 111). Many are choosing to rarely leave their homes, out of fear of being seized by ICE, and feel unsafe and fearful when they do so. (*Id*. ¶¶ 70, 83, 98-100, 111, 134-135, 150-151, 165-166). All of this is so even though the plaintiffs have done everything they were supposed to do in order to enter and remain in the United States lawfully.

The uncertainty that has been thrusted upon the Students is palpable. Mr. Dai received a notice from the United States Embassy in Beijing that states "deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin." (Dkt. 1 ¶ 91). Mr. Zhu received a similar notice. (*Id*. ¶ 63). Mr. Odeoze's notice from a school official ominously states that "[t]here is no grace period with this termination." (*Id*. ¶ 122). This is the terror that the Students live with daily, despite the fact that they have complied with every requirement necessary to maintain their lawful status in the United States.[5]

_____

[5]    Six of the plaintiffs in the current lawsuit initially joined their claims with a plaintiff whose venue was in the Southern District of Indiana and moved for a temporary restraining order. *See Liu, et al. v. Noem, et al*, 1:25-cv-716-JPH-TAB. The court acknowledged that federal venue rules

On top of everything else, involuntary removal is a particularly harmful event, which in addition to the traumatic experience of detention and deportation, would have devastating consequences on the Students' ability to return to the United States in the future. *See* 8 U.S.C. § 1182(a)(9)(A).

**Legal Standard**

As this Court has described, "[t]he standards for issuing a temporary restraining order are analogous to the standard for preliminary injunctive relief." *Neal v. Operators of Digital Props. Set Forth in Exhibit 1*, No. 2:24-CV-263-GSL-AZ, 2024 WL 4891528, at *4 (N.D. Ind. Nov. 26, 2024), *reconsideration denied*, No. 2:24-CV-263-GSL-AZ, 2024 WL 5055078 (N.D. Ind. Dec. 9, 2024) (citing *Levas v. Village of Antioch*, 684 F.2d 446, 448 (7th Cir. 1982)). "The court may grant a TRO if the movant: (1) has some likelihood of succeeding on the merits, (2) has no adequate remedy at law, and (3) will suffer irreparable harm if the order is denied." *Id.* (citations omitted). This standard is met here.

---

permit additional parties to be joined "if they assert a right to relief . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." (*Liu* Dkt. 24 at 9-10). But, pursuant to its discretion to deny joinder "in managing and structuring civil litigation for fair and efficient resolution of complex disputes," the court ordered the plaintiffs who resided in the Northern District, if they did not choose to voluntarily dismiss their claims, to show cause as to why the Court should not dismiss them. (*Liu* Dkt. 24 at 10). The plaintiffs voluntarily dismissed their claims and have filed the instant lawsuit. While the plaintiffs acknowledge that Judge Hanlon concluded, in denying a temporary restraining order, that the plaintiffs had failed to demonstrate irreparable harm, that conclusion cannot be squared with the facts articulated above and the legion of cases cited below that have found that this precise harm is irreparable harm for purposes of the receipt of a temporary restraining order. Judge Hanlon's decision is clearly an outlier.

**Argument**

**I. The Students will prevail on their legal claims**

    **A. The termination of the Students' F-1 status violates the Administrative Procedure Act**

        **1. The United States's termination of the Students' F-1 status is a final agency action subject to judicial review**

The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. As a prerequisite to review, the APA requires "final agency action," 5 U.S.C. § 702, which generally means that the agency has "completed its decisionmaking process" *Franklin v. Mass.*, 505 U.S. 788, 797 (1992). A reviewing court may hold unlawful and set aside an agency's action to the extent it is, among other things, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706. The actions of the defendants are unlawful under any of those measures, and relief must be granted under the APA.

In *Jie Fang*, the Third Circuit answered whether the termination of F-1 status and a corresponding SEVIS record is a final agency action. There the court addressed a situation in which the United States had terminated the F-1 status and SEVIS records of

[11]

students for alleged fraudulent enrollment in a fictitious American university. 953 F.3d at 174. After reviewing the law cited above, the regulatory requirements, and the cognizable grounds for status termination, the court held "that the termination of the students' F-1 visa status in the manner that occurred here is not akin to the initiation of the agency's decisionmaking process. Rather, it is the culmination of the process." *Id.* at 183-84. The court rejected the argument that the students could seek reinstatement of their F-1 status, or challenge the termination in removal proceedings, as an immigration judge cannot review status termination. *Id.* at 185. "The order the terminating the students' F-1 visa status was therefore a final order for jurisdictional purposes because there was no further opportunity for review." *Id.*

All of the court's holdings in *Jie Fang* apply here, as has been made abundantly clear by the federal courts nationwide reviewing this current wave of status and SEVIS terminations. (Dkts. 5-4 at 4 [*Zhou v. Lyons*, 2:25-cv-2994 (C.D. Cal.) (concluding that the termination of status was a final agency action subject to judicial review)]; 5-5 at 10 [*Student Doe v. Noem et al.*, 2:25-cv-1103-DAD-AC (E.D. Cal.) (same)]; 5-7 at 9 [*Jane Doe 1 et al. v. Bondi et al.*, 1:25-cv-1998-VMC (N.D. Ga.) (same)]; 5-14 at 3 [*Patel v. Bondi et al.*, 1:25-cv-101-SPB-WSH (W.D. Pa.) (same)]; 5-15 at 8 [*Doe v. Noem et al.*, 2:25-cv-633-DGE (W.D. Wash.) (same)]. The termination of the Students' status is a final agency action subject to this Court's review.

2. **The United States's termination of the Students' F-1 status was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law and the Constitution**

The Students have complied with federal law, have fulfilled all the requirements necessary to maintain their F-1 status, and have remained in good standing at their schools. Nonetheless, the United States has terminated their status. This is unlawful.

To maintain lawful F-1 status, individuals must maintain a full course of study, and they may not engage in unauthorized employment, provide false information to the Department of Homeland Security, or engage in "criminal activity." 8 C.F.R. § 214.2(e)-(g). Criminal activity is specifically defined to include convictions "for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed)." None of the Students has failed to maintain a full course of study, engaged in unauthorized employment, or provided false information to the Department of Homeland Security. And none has a criminal conviction as defined in 8 C.F.R. § 214.1(g). They have done nothing, therefore, that could cause them to "lose" status by their own actions.

In the absence of any of those activities, ICE can *only* terminate their F-1 status under three circumstances: (1) a previously-granted waiver under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. 8 C.F.R. § 214.1(d); *see also*

*Jie Fang,* 935 F.3d 172, 185 n. 100. The United States has done none of those things, and it does not appear to have argued to the contrary in any of the pending F-1 termination cases.  Instead, DHS terminated their F-1 status, caused that termination to be reflected in a tracking system, and communicated that termination to their Universities.

This is a prime example of an agency action that must be reversed under the APA as an "agency is not free to ignore or violate its regulations when they remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 59. 526 n.20 (D.C. Cir. 1978). "An agency's failure to follow its own regulations has traditionally been recognized as reviewable under the APA." *Head Start Fam. Educ. Program. Inc. v. Coop. Educ. Agency 11*, 46 F.3d 629, 633 (7th Cir. 1995) (footnote and further citation omitted). "Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Env. Dev. Assn's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation and citation omitted).

A veritable landslide of district courts over the past ten days have reached the same conclusion when addressing these terminations, including a district court within the Seventh Circuit.  In *Isserdasani et al v. Noem et al.*, 3:25-cv-283-WMC (W.D. Wisc.), the court issued a temporary restraining order as to a student-plaintiff whose status was terminated. (Dkt. 5-16).  Describing that the only purported ground for that student's status termination was a dismissed misdemeanor charge, the court found that no grounds supported the United States's action. As such, the court concluded that "plaintiff

Isserdasani has shown a substantial, if not overwhelming, likelihood of success on the merits of his claim in Count 2 that DHS violated the APA when it summarily terminated his F-1 student status in SEVIS without cause." (Dkt. 5-16 at 9). Further, said the court, "[s]pecifically, based on the record currently before the court, Isserdasani is likely to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A)." (*Id.* at 9-10).

This analysis is echoed by a chorus of other courts addressing these status terminations and granting temporary restraining orders against them:

- "Plaintiff has shown a likelihood of success on the merits of his claim that the Government violated the APA when it terminated Plaintiff's SEVIS record and, in effect, his F-1 status. Based on the record before the Court, Plaintiff is likely to show that ICE exceeded its legal authority in terminating Plaintiff's SEVIS record by failing to comply with 8 C.F.R. § 214.1(d), and that the termination was arbitrary, capricious, an abuse of discretion, or otherwise unlawful." (Dkt. 5-4 at 5 [*Zhou v. Lyons*, 2:25-cv-2994 (C.D. Cal.)]).

- "Because plaintiff offers evidence supporting the conclusion that neither reason given for termination is permitted by the applicable regulations, plaintiff will also likely show that defendants' decision to terminate his SEVIS record, effectively terminating his F-1 status, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA." (Dkt. 5-5 at 11 [*Student Doe v. Noem et al.*, 2:25-cv-1103-DAD-AC (E.D. Cal.)]).

- "Since none of those conditions are applicable here, Plaintiffs are likely to show that Defendants' termination of their F-1 status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A)." (Dkt. 5-7 at 9-10 [*Jane Doe 1 et al. v. Bondi et al.*, 1:25-cv-1998-VMC (N.D. Ga.)]).

- "None of those three circumstances appear to be present in this case, as the record before the Court indicates that no waiver has been revoked, no private bill has been introduced, and no notification in the Federal Register has been published. An agency's unexplained refusal to follow its own regulations effecting individuals' procedural benefits poses a high probability that the agency is not acting in accordance with the APA." (Dkt. 5-10 at 4-5 [*Ratsantiboon v. Noem et al.*, 0:25-cv-1315-JMP-JFD (D. Minn.)]).

- None of these mechanisms have been employed in this case. 8 C.F.R. § 214.1(d) does not provide statutory or regulatory authority to terminate F-1 student status in SEVIS based upon revocation of a visa. *See Fang v. Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172, 185 n. 100 (3d Cir. 2019). Moreover, Plaintiffs' academic record and lack of criminal history fails to support an alternative basis for termination of their F-1 status; at any rate, DHS's decision does not purport to rely upon such a reason. (Dkt. 5-11 at 7 [*Roe et al. v. Noem et al.*, 2:25-cv-40-DLC (D. Mont.)]).

- "Liu has shown a likelihood of success on the merits of his claim in Count 2, that DHS violated the APA when it terminated his F-1 student status in the SEVIS system. Based on the record before the court, Liu is likely to show that DHS's termination of his F-1 student status was not in compliance with 8 C.F.R. § 214.1(d) and was arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law." (Dkt. 5-12 at 3 [*Liu v. Noem et al.*, 1:25-cv-133-SE-TSM (D.N.H.)]).

- "With respect to DHS terminations, it does not appear that DHS terminated Patel's SEVIS registration or terminated her F-1 visa pursuant to its limited authority to do so." (Dkt. 5-14 at 4 [*Patel v. Bondi et al.*, 1:25-cv-101-SPB-WSH (W.D. Pa.)]).

- "Accordingly, termination of the SEVIS record because of the DUI arrest is inconsistent with agency regulations, which renders the decision invalid. Because Defendants' termination of Plaintiff's SEVIS record was—based on the limited information currently available—not authorized by and violated their own regulations, Plaintiff is likely to succeed in the argument that the agency action is not in accordance with law under § 706(2)(A)." (Dkt. 5-15 at 12 [*Doe v. Noem et al.*, 2:25-cv-633-DGE (W.D. Wash.)]).

The same result must issue here. Each of the Students' status terminations have occurred

contrary to DHS's regulations and the law, and the United States has failed to comply

with the APA.[6]

**B.      The Students are likely to prevail on their due process claim**

It is beyond debate that the Due Process Clause of the Fifth Amendment applies

to noncitizens present in the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)

("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process

Clause applies to all 'persons' within the United States, including aliens, whether their

presence here is lawful, unlawful, temporary, or permanent."). A plaintiff claiming a

violation of their right to procedural due process must establish "(1) a protected property

interest; (2) a deprivation of that property interest by someone acting under color of . . .

law; and (3) a denial of due process." *Booker-El v. Superintendent*, 668 F.3d 896, 900 (7th

Cir. 2012) (citation omitted). These standards are met here.

**1.      The Students have a protected property interest in their F-1 status**

"[I]n any due process case where the deprivation of property is alleged, the

threshold question is whether a protected property interest actually exists." *Cole v.

Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (citations omitted). Such

---

[6]      In other litigation, the United States has characterized the termination of students' F-1 status as an issue of mere recordkeeping.  Suffice it to say that is most assuredly not the case: while the termination of a student's F-1 status is reflected in, and schools are notified through, SEVIS, at issue here is the substantive decision of the United States to terminate nonimmigrant student status.

an interest attaches whenever "benefits are a matter of statutory entitlement for persons qualified to receive them." *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970). Thus, in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), the Supreme Court reiterated that property interests are "created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understanding that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. In other words, "[a] protected property interest exists only when the [government's] discretion is 'clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met,'" *Booker-El*, 668 F.3d at 900 (quoting *Brown v. City of Michigan City*, 462 F.3d 720, 729 (7th Cir. 2006))—that is, such an interest exists when a benefit "can be revoked only 'for cause,'" *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (citing *Barry v. Barchi*, 443 U.S. 55, 64 (1979)). Time and again, both the Supreme Court and the Seventh Circuit have reiterated these fundamental principles. *See also, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978); *Bishop v. Wood*, 426 U.S. 341, 344-45 (1976); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Rebirth Christian Academy Daycare, Inc. v. Brizzi*, 835 F.3d 742, 746-47 (7th Cir. 2016); *Colburn v. Trustees of Ind. Univ.*, 973 F.3d 581, 589 (7th Cir. 1992); *Farmer v. Lane*, 864 F.2d 473, 478 (7th Cir. 1988); *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987).

Here, an international student's F-1 status may only be terminated for "good cause." As noted, "the ability to terminate an F-1 visa is limited by [8 C.F.R.] § 214.1(d)." *Jie Fang*, 935 F.3d at 185 n.100. That regulation provides only three circumstances under which a student's F-1 status may be terminated: (a) when "a waiver authorized on his or her behalf under" 8 U.S.C. § 1182(d)(3) or (4) is revoked; (b) when "a private bill to confer permanent resident status on such alien" is introduced; and (c) when notification of the termination is published in the Federal Register "on the basis of national security, diplomatic, or public safety reasons." *See also, e.g.*, *In re Beck*, 2008 WL 3919071, at *2 (BIA July 24, 2008) (nonprecedential) ("With a few unusual exceptions, *see* 8 C.F.R. § 214.1(d), the regulations do not authorize the DHS, or any other entity, to 'terminate' or 'revoke' an alien's F-1 status; instead, the regulations contemplate only that an alien admitted in F-1 status may . . . fall 'out of status' or 'fail to maintain status.'").

The inability to terminate a student's F-1 status unless specific preconditions are met confers a property interest and, with it, the protections of the Due Process Clause.[7]

---

[7]     The Students acknowledge that the district court in *Louhghalam v. Trump*, 230 F. Supp. 3d 26 (D. Mass. 2017), concluded that "F-1 plaintiffs have no property or liberty interest in [their] visas and thus no due process claim with respect to the supposed revocation." *Id.* at 36. A visa, however, differs significantly from an immigration status: a visa is merely an entry document—the plaintiffs in *Louhghalam* were both lawful permanent residents detained at Boston Logan International Airport based on an Executive Order prohibiting entry from seven specific countries—and says very little about an individual's status.

In cases similar to this one, the United States has also relied on *Yunsong Zhao v. Va. Polytechnic Inst. & State Univ.*, 2018 WL 5018487, at *5-6 (W.D. Va. Oct. 16, 2018), as support for its contention that students lack a property interest in their F-1 status. But that case arose when a student sued his university for "the ministerial act of modifying [his] SEVIS record": to the extent

2.      **The Students have suffered a deprivation of their property without being afforded any process whatsoever**

Insofar as the Students possess a property interest in maintaining their F-1 status, the remaining questions to be asked are whether they suffered a deprivation of their property and whether constitutionally adequate process was provided. *See Booker-El*, 668 F.3d at 900. Neither can be seriously disputed.

The deprivation here is clear. The Students' F-1 status was terminated such that they cannot continue their studies in the United States and must instead promptly depart the country: this is the quintessential deprivation of property. *See, e.g., Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) (describing actions even short of "revocation or nonrenewal" of a license that constitute a deprivation of property), *overruled on other grounds by Brunson v. Murray*, 843 F.3d 698, 713-14 (7th Cir. 2016). And this is not a case that hinges on the occasionally difficult determination of *how much* process is due, for absolutely no process was afforded to the Students. The fundamental requisite of due process of law is the opportunity to be heard," *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), and at the very least due process thus requires "some kind of notice and . . . some kind of hearing," *Goss v. Lopez*, 419 U.S. 565, 579 (1975); *see also, e.g., Zinermon v. Burch*, 494 U.S.

_____

that record implicated the plaintiff's immigration status, the court concluded only that any due process "is the prerogative of and provided in the immigration courts, not the hallways of Virginia Tech." The court did not even purport to address any process that the United States is obligated to provide, although it appeared to assume that the termination of a student's F-1 status may be meaningfully challenged through the immigration system. As this case makes clear, that is simply not true.

113, 127-28 (1990) (noting that "the Court usually has held that the Constitution requires some kind of hearing before the State deprives a person of liberty or property" and collecting cases) (emphasis omitted). Here, absolutely none of the hallmarks of due process were provided to the Students prior to—or even after—the termination of their F-1 status.

It is not enough, as the United States has contended elsewhere, that the Students may seek reinstatement of their F-1 status or that they will be afforded process if and when removal proceedings are initiated. The reinstatement of F-1 status is wholly discretionary with the United States and dependent on the Universities willingness and ability to issue reinstatement and appears to be limited to unforeseeable events such as "serious injury or illness," "a natural disaster," or a school's "oversight," and does not allow for an appeal. *See* 8 C.F.R. § 214.2(f)(16); *see also Jie Fang*, 935 F.3d at 183. And, if that were not enough—and it is—any contention that this is sufficient process is the functional equivalent of saying that a recipient of public benefits has no right to challenge the termination of those benefits because she may always reapply. *But see Goldberg v. Kelly*, 397 U.S. 254, 263-64 (1970). Nor do potential removal proceedings afford meaningful process. Not only is the termination of a student's F-1 status not reviewable in these proceedings (Dkt. 5-1 ¶ 20) but the Students have lost their F-1 status *today*: they cannot continue their education, those employed through their universities have been terminated, and they are required to immediately depart the United States as the notices

received by some of the Students directed them to do. The United States's willingness to potentially afford them process at some indeterminate point in the future *if* they choose to stay in the country without lawful status, cannot be reconciled with fundamental due-process principles (which, among other things, require a pre-deprivation hearing). *See Jie Fang*, 935 F.3d at 183-84.  And, of course, an order of involuntary removal would carry significant collateral consequences on an individual's ability to return to this country, *see* 8 U.S.C. § 1182(a)(9)(A), and the United States's insistence that students must risk these consequences simply to challenge the termination of their F-1 status would dramatically disincentivize the exercise of their constitutional rights.

The process-less termination of the Students' F-1 status thus also runs afoul of the Fifth Amendment.

## II.    The other factors weigh in favor of the temporary restraining order

The severe and irreparable harm that the Students are enduring and will continue to face in the absence of equitable relief is plain. The Students not only face the disruption of their education, University jobs, and careers (Dkt. 1 at ¶¶ 49, 54; 66-68; 81; 92; 95-96; 106; 110; 117; 125; 138-139; 146; 154; 162-163), but they also face financial harms for which they have no legal remedy, including payments for tuition (*id.* ¶¶ 53, 69), housing (*id.* ¶¶ 82, 97, 131, 147), and vehicles (*id.* ¶ 131). They may also be accruing unlawful presence, which could negatively impact any future entry to the United States.  (Dkt. 5-1 ¶ 14).

But of course, the most significant harm arises from the fact that they may be swept from their homes, their campuses, or their city streets, placed in detention facilities, and subjected to involuntary removal—including to countries of which they are not citizens. (*Id.* ¶¶ 54-55; 70; 83; 98, 100; 111; 134-135; 150-151; 165-166). Not surprisingly, this is causing them to suffer depression (*id.* ¶¶ 55, 150), difficulty sleeping (*id.* ¶¶ 55, 70, 83, 111), nightmares (*id.* ¶¶ 70, 111), and severe stress and anxiety (*id.* ¶¶ 83, 98-100, 111, 134, 166). Many are choosing to rarely leave their homes, out of fear of being seized by ICE, and feel unsafe and fearful when they do so. (*Id.* ¶¶ 70, 83, 98-100, 111, 134-135, 150-151, 165-166). This is the terror that the Students live with daily, despite the fact that they have complied with every requirement necessary to maintain their lawful status in the United States. And because the termination of their status, as reflected in the SEVIS record, is not reviewable in removal proceedings, the termination of a student's lawful status, as has occurred here, risks resulting in the Students not being able to contest the validity of the termination that is the cause for the removal.

This is irreparable harm, and courts across the country have had little difficulty in so finding. (Dkts. 5-2 at 1 [*Kshatri v. Lyons*, 2:25-cv-553-MHH (S.D. Ala.)]; 5-3 at 2 [*Arizona Student DOE #2 v. Trump et al.*, 4:25-cv-175-TUC-AMM (D. Ariz.)]; 5-4 at 5 [*Zhou v. Lyons*, 2:25-cv-2994 (C.D. Cal.)]; 5-5 at 15 [*Student Doe v. Noem et al.*, 2:25-cv-1103-DAD-AC (E.D. Cal.)]; 5-6 *Hinge v. Lyons*, 1:25-cv-1097-RBW (D.D.C.) (only docket text accessible)]; 5-7 at 11-12 [*Jane Doe 1 et al. v. Bondi et al.*, 1:25-cv-1998-VMC (N.D. Ga.)]; 5-8 [*Doe v. Noem et al.*,

1:25-cv-10904-PBS (D. Mass.) (only docket text accessible)]; 5-9 at 1 [*Zheng v. Lyons*, 1:25-cv-10893-FDS (D. Mass.)]; 5-10 at 3-4 [*Ratsantiboon v. Noem et al.*, 0:25-cv-1315-JMP-JFD (D. Minn.)]; 5-11 at 7-8 [*Roe et al. v. Noem et al.*, 2:25-cv-40-DLC (D. Mont.)]; 5-12 at 3-5 [*Liu v. Noem et al.*, 1:25-cv-133-SE-TSM (D.N.H.)]; 5-13 at 1 [*Wu et al. v. Lyons*, 1:25-cv-1979-NCM (E.D.N.Y.)]; 5-14 at 4-5 [*Patel v. Bondi et al.*, 1:25-cv-101-SPB-WSH (W.D. Pa.)]; 5-15 at 14-18 [*Doe v. Noem et al.*, 2:25-cv-633-DGE (W.D. Wash.)]; 5-16 at 10 [*Isserdasani et al v. Noem et al.*, 3:25-cv-283-WMC (W.D. Wisc.)]).

The United States will suffer no harm if a temporary restraining order is entered. Even if there were some basis to terminate the Students' F-1 status—and there is not—there was no compelling need for the United States to act with such profound dispatch and to do so without affording the most rudimentary opportunity for the Students to be heard. The temporary restraining order will merely maintain the status quo that existed before early April of this year. And it would certainly "serve the public interest to ensure that defendants follow the law." *Friends of Blue Mound State Park v. Wisc. Dep't of Nat. Res.*, No. 21-cv-676-jdp, 2024 WL 1328478, at *4 (W.D. Wisc. Mar. 28, 2024).

## Conclusion

All the requirements for the issuance of a temporary restraining order are met and one should issue ordering the United States to set aside the terminations of the Students' F-1 status, as reflected in their SEVIS records, and restraining the United States from detaining or initiating removal proceedings against the Students. Once the

temporary restraining order is issued, the Court should set a schedule for resolution of

the motion for preliminary injunction.[8]


Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org


Sarah L. Burrow
LEWIS KAPPES
One American Square, Suite 2500
Indianapolis, IN 46282
317/639-1210
fax: 317/639-4882
SBurrow@lewis-kappes.com

Attorneys for Plaintiffs

---

[8] Inasmuch as the temporary restraining order will not cause any monetary injuries to the United States, it should issue without bond. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (noting cases that "allow a district court to waive the requirement of an injunction bond [where] the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction").

## Certificate of Service

I certify that a copy of the foregoing was served by first-class U.S. postage, pre-paid, on the below-named defendants on this 21st day of April 2025.

Kristi Noem
Secretary
United States Department of Homeland Security
245 Murray Lane SW
Washington, D.C. 20258

Todd Lyons
Acting Director
United States Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20535

I further certify that a courtesy copy was also sent via electronic mail on the 21st day of April 2025 to:

Sharon Jefferson
Chief, Civil Division
Office of the United States Attorney
Northern District of Indiana
Sharon.jefferson2@usdoj.gov

Kenneth J. Falk
Attorney at Law